UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELIZABETH GRADY SCHOOL OF ESTHETICS AND MASSAGE THERAPY, et al., | |
| Plaintiffs, | Civil Action No. 23-12461-ADB |
| v. | **Leave to File Excess Pages Granted on November 16, 2023** |
| MIGUEL CARDONA, *in his official capacity as Secretary of Education*, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' <u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## I.      INTRODUCTION

Elizabeth Grady, a postsecondary educational institution, along with its corporate owners, seek a preliminary injunction enjoining the Secretary of Education from "terminating and/or limiting" the school from participating in federal financial aid programs under Title IV of the Higher Education Act, and requiring the Secretary to provide the school with more than one million dollars in student financial assistance.   Federal law, however, expressly precludes courts from entering an injunction against the Secretary—including provisional relief.   The Court should therefore deny the instant motion on that basis alone.   But, in all events, Plaintiffs have clearly failed to establish their entitlement to the extraordinary remedy of a preliminary injunction.   The Secretary informed Elizabeth Grady that it had lost eligibility for financial assistance back in May 2023.   Yet, Plaintiffs did not file this motion for the next five months, belying any need for the sudden and drastic action that they insist upon now.

What's more, rather than directly challenge the merits of this eligibility determination, Plaintiffs merely claim that the Secretary's regulations required him to provide them with a hearing beforehand.   But those hearing procedures apply only when the Department seeks to limit or terminate an institution's participation in Title IV programs.   By contrast, Elizabeth Grady's eligibility *automatically expired* when it underwent a change in ownership in November 2021. And although Plaintiffs could have sought to reinstate the school's eligibility and avoid a lapse in funding, they instead refused to inform the Secretary about this change in ownership at all.   This is a problem of Elizabeth Grady's own making.   For these reasons and those described below, the Court should deny the motion, and this case should proceed in the ordinary course.

## II.   BACKGROUND

### A.  Legal Framework

#### 1.   Federal Funding under the HEA.

Congress enacted the Higher Education Act of 1965 (HEA) "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." 79 Stat. 1219.  "To that end, Title IV of the Act restructured federal financial aid mechanisms" and established several types of student loan and grant programs. *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).  The Department of Education administers these programs, and funding is provided to educational institutions which is then disbursed for the benefit of their qualifying students.  *See* 20 U.S.C. §§ 1070(b), 1094; 34 C.F.R § 668.162.  The Secretary retains sole discretion in deciding how to provide such funding.  20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement . . . as the Secretary may determine."); *see also* 34 C.F.R. § 668.162(a) ("the Secretary has the sole discretion to determine the method under which the Secretary provides Title IV program funds to an institution").

"Under Title IV, for-profit, post-secondary educational institutions" may only "participate in the Title IV aid programs if they [meet] certain requirements."  *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 102 (1st Cir. 2015).  For example, a school seeking Title IV funding must qualify as "an institution of higher education," such as "a proprietary institution of higher education," or "a postsecondary vocational institution."  20 U.S.C. § 1002(a)(1); *see also Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 776–77 (1st Cir. 2000) ("To participate in the student assistance program, an educational institution must be an 'eligible' institution of higher education." (citing 20 U.S.C. § 1094(a))).  Moreover, the institution must "enter into a program

participation agreement with the Secretary."  20 U.S.C. § 1094(a).  A program participation

agreement "condition[s] the initial and continuing eligibility of an institution" on its compliance

with several statutory requirements, as well as regulations issued by the Secretary.  *Id.*

### 2.  Regulations Governing Eligibility and Termination.

From its initial enactment, the HEA empowered the Secretary to "prescribe such

regulations as may be necessary to carry out" its purposes.  79 Stat. 1246.  To that end, in 1974,

the Secretary proposed a set of regulations "establish[ing] requirements and standards that

educational institutions must comply with in order to participate" in Title IV programs.  39 Fed.

Reg. 37154 (Oct. 17, 1974).  These regulations included rules governing the eligibility status of

institutions that undergo a change in ownership.  *Id.* at 37157.  The final version of these

regulations, published the following year, provided that "[i]f a participating institution undergoes

a change of controlling ownership or form of control, its [participation] agreement shall

automatically expire at the time of such change."  40 Fed. Reg. 7595 (Feb. 20, 1975).  Although

this rule has been modified over the years, the pertinent version—the version in effect at the time

of the events giving rise to the complaint—similarly provided that an institution "that undergoes a

change in ownership that results in a change in control ceases to qualify as an eligible institution

upon the change."  34 C.F.R. 600.31(a)(1) (2021).[1]

Also in 1974, the Secretary proposed a separate set of regulations setting forth "the

procedures to be followed . . . in limiting, suspending or terminating the eligibility of educational

institutions" under Title IV.  39 Fed. Reg. 37154 (Oct. 17, 1974).  These regulations sought to

---

[1] Moreover, the enabling statute itself has been amended to provide that "[a]n eligible institution of higher education that has had a change in ownership resulting in a change of control shall not qualify to participate in programs under this subchapter after the change in control," except in limited and specified circumstances.  20 U.S.C. § 1099c(i)(1).

provide, among other things, "administrative procedures" for terminating an institution's eligibility based on its "failure to comply with applicable law, regulations, agreements or limitations." *Id.* at 37155.  The final version of these regulations—referred to as Subpart G— provided that, when the Secretary seeks to terminate an institution's eligibility, it must first provide notice and the opportunity "to request a hearing before the . . . termination takes effect."  40 Fed. Reg. 7598 (Feb. 20, 1975).  The current version—in effect at the time of the events giving rise to the complaint—likewise provides that, if an institution requests a hearing, the "termination does not take place until the requested hearing is held."  34 C.F.R. § 668.86(b)(3).

The Secretary has thus consistently treated (i) the automatic expiration of an institution's eligibility (due to a change in ownership) as distinct from (ii) a decision to terminate an institution's eligibility (due to a violation of applicable requirements).  For example, in 1980, the Secretary issued regulations known as the "Student Assistance General Provisions," which clarified that an institution "that changes ownership resulting in a change in control is not considered by the Secretary to be the same institution."  45 Fed. Reg. 86854, 86861 (Dec. 31, 1980).  And, in 1987, these rules were amended to provide that "*[e]xcept as provided in paragraph (e) of this section,*" the Secretary will "terminate[] a participation agreement through the [notice and hearing] procedures set forth in Subpart G."  52 Fed. Reg. 45728 (Dec. 1, 1987) (emphasis added). Paragraph (e), in turn, specified that "[a]n institution's participation agreement automatically terminates on the date the institution changes ownership that results in a change in control."  *Id.* The pertinent version of this regulation similarly provided that "[e]xcept as provided in paragraphs (g) and (h)," the Secretary will "terminate[] a program participation agreement through the proceedings in subpart G."  34 C.F.R. § 668.14(f) (2021).  Paragraph (g), in turn, provided that

4

"[a]n institution's program participation agreement automatically expires on the date that . . . [t]he institution changes ownership that results in a change in control." *Id.* § 668.14(g) (2021).

As these regulations reflect, and as the Secretary has long recognized, a change of ownership and control of an institution marks a profound change. When an institution changes ownership and control, the institution must notify the Department and apply to continue participating in the student aid programs as the same institution, and the Department must therefore evaluate the institution's eligibility, financial condition, and administrative capability under its new ownership. Indeed, a change of ownership and control must be approved not only by the Department, but must first be approved by the school's state authorizing agency and accrediting agency. *See* 34 C.F.R. § 600.20(h)(3)(ii) and (iii) (2021).

During the relevant time, the Department's regulations also specified that certain transactions—referred to as "[e]xcluded transactions"—would not result in the automatic expiration of an institution's eligibility. 34 C.F.R. § 600.31(e) (2021). For example, the regulations stated that "[a] change in ownership and control reported under § 600.21 and otherwise subject to this section does not include a transfer of ownership and control of all or part of an owner's equity," "[u]pon the retirement or death of the owner," to someone who had already retained an "ownership interest" and had "been involved in management of the institution for at least two years preceding the transfer." *Id.* § 600.31(e)(2) (2021). The regulations further defined an "ownership interest" as "a legal or beneficial interest." *Id.* § 600.31(b) (2021). Thus, a transfer of equity from a retiring owner to someone who had already enjoyed an ownership interest in (and helped manage) the school for two years would not necessarily result in the automatic expiration of eligibility. However, the institution must still report the change to the Secretary in a timely

5

manner for it to qualify as an excluded transaction. *Id.* § 600.31(e) (2021) (referring to a "change in ownership and control *reported under § 600.21*") (emphasis added); *see also* 34 C.F.R. § 600.21.

### 3. The Anti-Injunction Clause of the HEA.

"Absent a waiver, sovereign immunity shields the Federal Government"—including its officers—"from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also McCloskey v. Mueller*, 446 F.3d 262, 272 (1st Cir. 2006) ("bedrock principles of sovereign immunity" bar suits "against the United States, its agencies, or federal officers sued in their official capacities"). To sue the United States—including its officers—a plaintiff must therefore identify an express waiver in the text of a federal law and show that its claim falls within this scope. *See, e.g.*, *FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text"). Otherwise, no court has jurisdiction to hear the plaintiff's claim. *Meyer*, 510 U.S. at 475 ("Sovereign immunity is jurisdictional in nature.").

The HEA includes a limited waiver of sovereign immunity by providing that the Secretary may "sue and be sued" "with respect to, the functions, powers, and duties, vested in him by" the statutory provisions governing financial assistance programs. 20 U.S.C. § 1082(a)(2). That said, this waiver includes a carveout concerning the remedies that a court may provide, and states that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control." *Id.* Accordingly, a district court may not exercise jurisdiction over claims seeking to require the Secretary to take action (or refrain from taking action) with respect to his statutory functions. *See, e.g.*, *Devine v. Transworld Sys. Inc.*, No. 16-cv-11535-ADB, 2016 WL 6871232, at *1 n.1 (D. Mass. Nov. 21, 2016) ("Defendant DOE also appropriately argues that it is immune from suit requesting injunctive relief.").

### B.  Procedural History

Elizabeth Grady provides educational programs to student pursuing licensing in the esthetics and massage therapy professions.  ECF No. 1 ¶ 1.  The school is owned and operated by Elizabeth Grady Face First, Inc., which, in turn, is owned by EGFF Holding Corp.  *Id.* ¶ 11. Plaintiffs assert that Elizabeth Grady has sought and received financial aid for its students under Title IV "for over 30 years."  *Id.* ¶ 15.  And they allege that "[a]pproximately 85% of students have utilized student financial assistance through [Title IV] to help fund their education through the [s]chool," after which they "go on to obtain positions in esthetics or massage therapy."  *Id.* ¶ 16.

Kathleen DeNicola began serving as the Chief Financial Officer of EGFF Holding Corp. in 2016.  *Id.* ¶ 18.  Just a few years later, she entered negotiations with its then-owner, John P. Walsh, to purchase the company.  *Id.* ¶ 23.  On September 8, 2021, Ms. DeNicola and Mr. Walsh executed a stock purchase agreement for Ms. DeNicola to acquire EGFF Holding Corp. and its assets—including Elizabeth Grady.  *Id.* ¶ 19.  According to Plaintiffs, Ms. DeNicola acquired EGFF Holding Corp. on November 1, 2021.  *Id.* ¶ 2.  Neither Ms. DeNicola nor Elizabeth Grady notified the Department about this transaction beforehand or at the time.  *Id.* ¶ 24.

While performing Elizabeth Grady's annual audit for FY 2021, an independent auditor flagged the transaction between Ms. DeNicola and Mr. Walsh, and concluded that it should have been reported to the Department.  ECF No. 1-9 at 2.[2]  The Department's regulations—in effect at the time—stated that "an eligible institution must report to the Secretary" certain changes within 10 days after they occur—including changes in ownership.  34 C.F.R. § 600.21(a)(6) (2021).

---

[2] The Department's regulations require that "[a]n institution that participates in any title IV, HEA program must at least annually have an independent auditor conduct a compliance audit of its administration of that program and an audit of the institution's general purpose financial statements."  34 C.F.R. § 668.23(a)(2).

Critically, the regulations also provide that an institution "that undergoes a change in ownership that results in a change in control *ceases to qualify as an eligible institution* upon the change in ownership and control." *Id.* § 600.31(a)(1) (2021) (emphasis added).  To avoid a lapse in funding, the Department may continue to provide Title IV assistance on a *provisional basis* while the Department reviews the institution's application for a change of ownership.  *Id.* § 600.20(g) (2021).  But, to receive this *temporary* funding, the institution must submit a "materially complete application" for reinstatement "no later than 10 business days after the day the change occurs." *Id.* § 600.20(g)(1) (2021).  Continued funding beyond an initial period of a maximum of two months requires the submission of additional documents.  *Id.* § 600.20(h)(3) (2021).  To that end, Elizabeth Grady's auditor recommended that Ms. DeNicola "discuss this [change in ownership] finding with [the Department] to take steps to resolve the issue as soon as possible."  ECF No. 1-9 at 2.

Nonetheless, Ms. DeNicola did not report the transaction at this time.  ECF No. 1 ¶ 24. Instead, she insisted that the transaction between her and Mr. Walsh did not amount to a "change in control."  ECF No. 1-9 at 3.  According to the auditor, Ms. DeNicola represented that the transaction did not amount to a change in control because she "had at least a 10% stake in" Elizabeth Grady's corporate owner for the two years prior to the transaction.  *Id.*  But, when asked to provide proof of that assertion, neither Ms. DeNicola nor Mr. Walsh provided any substantiating evidence.  *Id.*  The auditor then recommended that Ms. DeNicola report the transaction to the Department, but she declined to do so.  *Id.*  Elizabeth Grady also failed to submit its FY 2021 audit to the Department by the June 30, 2022, deadline.  *Id.* at 2.  Indeed, the school did not submit this audit until October 14, 2022—more than three months later.  *Id.*

After receiving this audit, the Department promptly contacted the auditor to ask about his finding.  *Id.* at 3.  The following month, it also contacted Ms. DeNicola to obtain information about

8

the transaction.  *Id.*  And, after sending multiple inquiries and reviewing the requested documentation, the Department agreed with the auditor and concluded that Elizabeth Grady had, in fact, undergone a change in ownership (which neither Ms. DeNicola nor any other school official reported), and failed to meet the regulatory requirements for continued participation.  *Id.* On May 12, 2023, the Department sent Ms. DeNicola a letter informing her of its determination that "Elizabeth Grady lost eligibility to participate in the student financial assistance programs authorized pursuant to Title IV . . . on November 1, 2021."  *Id.* at 1.  As a result, the Department placed Elizabeth Grady on a "Stop Pay" order (thus prohibiting the school from accessing or drawing down any remaining Title IV funds) and declined to grant its pending reimbursement request for the same reason.  *Id.*; *see also* ECF No. 1-10 at 1; ECF No. 1-11 at 1.

Later that month, Plaintiffs' counsel contacted the Department, seeking to discuss its determination that the school's eligibility had expired.  ECF No. 1-15 at 12–13.  Plaintiffs' counsel also requested a hearing, asserting that, "[u]nder 34 C.F.R. 668.86(b)," a "termination" should not take effect if the Department timely "receives a request for a hearing."  *Id.* at 8.  In response, the Department explained that a loss of eligibility following a change of ownership "is neither a limitation or termination, and therefore is not subject to the Subpart G requirements for a hearing." *Id.*  The Department also informed them that Elizabeth Grady could "seek[] to reestablish eligibility so it can be reinstated to participate in the Title IV, HEA programs."  *Id.* at 8–9.  To do so, the school would need to submit the required documents and information in the next 10 business days.  *Id.* at 9.  Plaintiffs' counsel then requested an additional 30 days, which the

Department promptly granted.  *Id.* at 5.  And, on October 19, 2023, Plaintiffs sought another 30-day extension to submit these materials, which the Department granted as well.  *Id.* at 2.[3]

The very next day, rather than taking the opportunity to submit the required materials and submit an application to reestablish eligibility, Plaintiffs instead filed the complaint in this case—asserting three causes of action.  ECF No. 1 at 21–25.  *First*, Plaintiffs seek a declaratory judgment "affirming that the Department has violated 34 C.F.R. § 668.86(b) and § 600.41(c)(1)" by "terminating" their eligibility without providing notice and a hearing.  *Id.* at 20.  *Second*, Plaintiffs seek an injunction under the Administrative Procedure Act (APA), arguing that the Department deprived them of due process by, again, failing to follow the notice-and-hearing procedures under 34 C.F.R. § 668.86.  *Id.* at 21–22.  *Third*, Plaintiffs seek a writ of mandamus, similarly arguing that the Department had "a mandatory, non-discretionary duty to provide notice and hearing to the [s]chool pursuant to 34 C.F.R. § 668.86."  *Id.* at 23.  A week later, Plaintiffs filed this motion, arguing that they are likely to succeed on the merits of all three of these claims.  ECF No. 4.

## III.   LEGAL STANDARD

 "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).  But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at

---

[3] To date, the Department still has not received all the documents and information needed to process the school's application for reinstatement.

24; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

Typically, the party moving for a preliminary injunction seeks "to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). Here, however, Plaintiffs seek "a mandatory preliminary injunction, which requires affirmative action by the non-moving party in advance of trial." *Braintree Laboratories, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 40–41 (1st Cir. 2010). "Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Id.* (citation omitted).

## IV.    ARGUMENT

### A.  The Court lacks jurisdiction to issue preliminary injunctive relief.

As a threshold and dispositive matter, Plaintiffs cannot obtain a preliminary injunction because the HEA precludes courts from enjoining the Secretary in the performance of his statutory functions—including the provision of financial aid. Although the APA generally authorizes courts to hear claims for "prohibitory or mandatory injunction[s]," 5 U.S.C. § 703, it also provides that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *id.* § 702. And, here, the HEA expressly forbids courts from issuing an "injunction" against the Secretary. 20 U.S.C. § 1082(a)(2). The Court therefore lacks jurisdiction to issue a preliminary injunction in this matter. *See, e.g.*, *Devine*,

2016 WL 6871232, at *1 n.1; *Kemper v. U.S. Dep't of Educ.*, 285 F. Supp. 3d 145, 148 (D.D.C. 2018) ("Defendants argue correctly that the [HEA] bars Plaintiff's claim for injunctive relief.").[4]

To be sure, sovereign immunity may not apply to allegations that an individual official has acted "ultra vires," meaning that he has clearly acted beyond his lawful authority. *Muirhead v. Mecham*, 427 F.3d 14, 19 (1st Cir. 2005) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)). The reason being that when individual officials act without any colorable legal basis, they are not actually acting on behalf of the "sovereign." *See id.* Thus, it is true that courts have occasionally entertained claims for injunctive relief against the Secretary based on allegations that he acted *outside* his sphere of delegated authority. But, in this case, Plaintiffs acknowledge that the Secretary has authority to make eligibility determinations. ECF No. 5 at 16; *see also* 20 U.S.C.§ 1094; 34 C.F.R. § 668.14(g) (2021). They simply contend that he erred in the *exercise and application* of that authority. ECF No. 1 at 20–24. As the First Circuit has explained, however, "an official's actions within the sphere of his or her delegated authority are not stripped of immunity even if those actions are based on an [allegedly] incorrect reading of the law or a mistaken assessment of the facts." *Muirhead*, 427 F.3d at 19–20. Plaintiffs thus cannot evade the anti-injunction clause by arguing that the Secretary has acted ultra vires.

Although Plaintiffs' motion seeks only a preliminary injunction, it bears noting that they could not obtain preliminary relief in the form of a declaratory judgment, either. *See Hamama v.*

---

[4] The fact that the instant motion seeks preliminary—as opposed to permanent—relief does not alter the analysis, seeing as the HEA prohibits courts from issuing injunctions whether "mesne or final." 20 U.S.C. § 1082(a)(2); *cf.* Black's Law Dictionary (11th ed. 2019) (defining "mesne" as "Occupying a middle position; intermediate or intervening"); Bryan A. Garner, *Garner's Dictionary of Legal Usage*, at 574 (3rd ed. 2011) (defining "Mesne process" as "all process issued between the commencement of a lawsuit by the initial writ or pleading and the termination of the suit").

*Adducci*, 946 F.3d 875, 878 (6th Cir. 2020) (Sutton, J.) ("The Supreme Court has [a] suggested preliminary declaratory judgment does not exist."). And, moving forward, Plaintiffs cannot obtain the declaratory judgment that they seek because it would effectively amount to an injunction. A traditional declaratory judgment provides a prospective opinion that resolves a dispute about the nature of a party's legal rights. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 478 (1974) (Rehnquist, J., concurring) (The "primary purpose" of the Declaratory Judgment Act "was to enable persons to obtain a definition of their rights before an actual injury had occurred."); Samuel L. Bray, *Preventive Adjudication*, 77 U. Chi. L. Rev. 1275, 1281 (2010) ("In [a declaratory judgment] action the plaintiff asks the court to issue an opinion, usually a prospective one, that will resolve an indeterminacy in how the law applies."). But, here, Plaintiffs seek a retrospective declaration that the Department has violated its own regulations by not providing them with notice and a hearing. ECF No. 1 at 20. In effect, they seek to require the Department to provide those procedures moving forward.

As several courts have concluded, however, a plaintiff may not evade the anti-injunction clause by seeking "declaratory relief" that "would have the same coercive effect as an injunction." *Am. Ass'n of Cosmetology Sch. v. Riley*, 170 F.3d 1250, 1255 (9th Cir. 1999); *see also, e.g.*, *Chinnock v. Navient Corp.*, 2019 WL 1767310, at *3 (N.D. Ohio Apr. 22, 2019) ("Chinnock cannot end-run § 1082(a)'s prohibition on injunctions through a declaration."); *Carr v. DeVos*, 369 F. Supp. 3d 554, 560 (S.D.N.Y. 2019) ("The Court concludes that the limited waiver of sovereign immunity does not allow declaratory relief that functions as injunctive relief by another name."); *DiNello v. U.S. Dep't of Educ.*, 2006 WL 3783010, at *4 (N.D. Ill. Dec. 21, 2006) ("declaratory relief is not permitted if it is coercive in nature or otherwise similar to injunctive relief"). Thus, while the anti-injunction clause does not generally bar claims for a declaratory judgment, its terms

"cannot be skirted by the simple expedient of labeling an action that really seeks injunctive relief as an action for 'declaratory relief.'" *Am. Ass'n of Cosmetology*, 170 F.3d at 1254.

"It is true that 'declaratory relief will not always be the functional equivalent of injunctive relief.'" *Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (citing *Alli v. Decker*, 650 F.3d 1007, 1014 (3d Cir. 2011)); *see also Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987) ("A declaratory judgment states the existing legal rights in a controversy, but does not, in itself, coerce any party or enjoin any future action."). "But in this case, it is the functional equivalent." *Hamama*, 912 F.3d at 880 n.8. After all, a declaration that the Department has erred by not providing Plaintiffs with a hearing would be of little use to them now (it would not relieve future uncertainty, nor would it set the stage for an injunction or damages), unless it effectively required the Department to hold such a hearing.

**B.  Plaintiffs have failed to establish a likelihood of success on the merits.**

Even setting aside the anti-injunction clause, Plaintiffs cannot obtain a preliminary injunction because they have not shown a likelihood of success on the merits. As the Court has often recognized, "proving likelihood of success on the merits is the '*sine qua non*' of a preliminary injunction." *Akebia Therapeutics*, 443 F. Supp. 3d at 225 (citation omitted)). "Therefore, '[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.*

**1.  Plaintiffs are not likely to succeed on their claim for a declaratory judgment.**

To begin, the Declaratory Judgment Act does not provide a standalone cause of action; rather it "merely defines the scope of available declaratory relief." *McCarthy v. Marshall*, 723 F.2d 1034, 1037 (1st Cir. 1983); *Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 177 (D.D.C. 2022) ("in general, a count for relief under the Declaratory Judgment Act is not cognizable

as a separate cause of action, but it is more properly included in the prayer for relief" (alterations adopted, citation omitted)).  Indeed, "the availability of such relief presupposes the existence of a judicially remediable right."  *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014) ("The point of the statute is to create a remedy for a preexisting right enforceable in federal court.").  But "[n]o such right exists here." *Schilling*, 363 U.S. at 677.  Because Plaintiffs have not identified an applicable cause of action, through which they could obtain a declaratory judgment, they are not likely to succeed.

In all events, the whole basis of Plaintiffs' claim for a declaratory judgment—i.e., that the Department violated its own regulations—is plainly incorrect.  "Plaintiffs seek a declaration affirming that the Department has violated" two of its own regulations—namely, 34 C.F.R. §§ 668.86(b) and 600.41(c)(1).  ECF No. 1 ¶ 89.  But neither of those regulations even applies. The first regulation—titled "Limitation or termination proceedings"—provides that the Department may "terminate an institution's participation" in Title IV if the institution violates any statute, regulation, or agreement applicable to Title IV.  34 C.F.R. § 668.86(a).  The Department begins a termination proceeding by sending "a notice by certified mail," which, among other things, informs the institution of "the proposed effective date of the . . . termination."  *Id.* § 668.86(b)(1)(ii).  And if the institution timely "requests a hearing," the termination "does not take place until after the requested hearing is held."  *Id.* § 668.86(b)(3).  The second regulation— titled "Termination and emergency action proceedings"—similarly states that "[a]n action to terminate" and institution's participation "becomes final 20 days after the Secretary notifies the institution of the proposed action, unless the designated department official receives by that date a request for a hearing."  34 C.F.R. § 600.41(c)(1) (2021).

Plaintiffs claim that the Department violated these regulations because it did not send them notice or hold a hearing at their request.  But those procedures—set forth in Subpart G of the Student Assistance General Provisions—apply when the Department seeks to *terminate* an institution's participation based on, for example, a regulatory violation.  Here, by contrast, the Department did not seek to terminate Elizabeth Grady's participation.  Instead, the institution "cease[d] to qualify as an eligible institution upon the change in ownership and control." 34 C.F.R. § 600.31(a)(1) (2021).  Indeed, the Department's regulations expressly provide that the notice-and-hearing procedures governing terminations *do not apply* when an institution undergoes a change in control: "the Secretary terminates a program participation agreement through the proceedings in subpart G," "*[e]xcept as provided in paragraphs (g)* and (h) of this section." 34 C.F.R. § 668.14(f)(1) (2021) (emphasis added).  Paragraph (g), in turn, applies when an institution undergoes a "change in control as determined by the Secretary," *id.* § 668.14(g)(1) (2021), which is precisely what happened here.

The regulations further distinguish between (i) the expiration of an institution's participation and (ii) the termination of an institution's participation with respect to the timing of those different types of events.  Again, the HEA conditions an institution's participation on its maintenance of "a program participation agreement with the Secretary." 20 U.S.C. § 1094(a). And the regulations make clear that "[a]n institution's program participation agreement automatically expires *on the date* that . . . [t]he institution changes ownership." 34 C.F.R. § 668.14(g)(1) (2021) (emphasis added); *see also* 34 C.F.R. § 600.31(a)(1) (2021) (providing that an institution "that undergoes a change in ownership that results in a change in control ceases to qualify as an eligible institution *upon* the change in ownership and control" (emphasis added)). By contrast, when the Department seeks to terminate an institution's participation, and the

16

institution requests a hearing, the termination does not take effect "until *after* the requested hearing is held." 34 C.F.R. § 668.86(b)(3) (emphasis added).  Put another way, when Elizabeth Grady's eligibility "automatically expire[d]," the school "no longer had an active [participation agreement] for the [Department] to terminate or suspend through procedures of any sort, including notice or hearing procedures." *San Juan City Coll., Inc. v. United States*, 74 Fed. Cl. 448, 454 (2006).

In addition, Plaintiffs briefly suggest that Ms. DeNicola "believe[d]" that her transaction with Mr. Walsh "was exempt under 34 C.F.R. § 600.31(e)." ECF No. 5 at 5.  As explained, the Department's regulations provided that certain transfers of equity in an institution would not result in an automatic expiration of its eligibility. The regulations specifically provided that "[a] change in ownership and control reported under § 600.21 and otherwise subject to this section does not include a transfer of ownership and control of all or part of an owner's equity," "[u]pon the retirement or death of the owner," to someone who had already retained an "ownership interest" in the institution and had "been involved in management of the institution for at least two years preceding the transfer." 34 C.F.R. § 600.31(e)(2) (2021).  And the regulations further defined an "ownership interest" as "a legal or beneficial interest." *Id.* § 600.31(b) (2021).  To that end— although Ms. DeNicola had originally sought to invoke this exemption by claiming that she owned 10% of EGFF Holding Co.—Plaintiffs *now* claim that she instead "believed" that she had retained a "beneficial interest" in the company for two years prior to the transaction.  ECF No. 5 at 5.

Plaintiffs do not, however, set forth any evidence—or even a colorable argument—that Ms. DeNicola obtained and maintained a beneficial ownership interest in EGFF Holding Co. two years prior to November 2021.  Instead, they claim that—during the negotiations—"it was understood between Mr. Walsh and Ms. DeNicola that she would receive a significant discount on the purchase price of EGFF Holding Co." *Id.*  And they assert that "[t]he [s]chool and Ms.

17

DeNicola believed that" her purported "option to purchase EGFF Holding Co. at a discount not available to other potential bidders constituted a beneficial interest." *Id.* But, not only do Plaintiffs fail to set forth any evidence of that alleged "option," they do not cite any legal authority suggesting that such an option or belief amounts to a beneficial ownership interest in a company.

Nor could they. The relevant regulation defined excluded transactions as including (among other requirements) a transfer of equity to a person who had obtained and maintained "an *ownership interest* in the institution" for two years before the transaction. 34 C.F.R. § 600.31(e) (2021) (emphasis added). It further explained that an "ownership interest" must have consisted of a "legal" ownership interest or a "beneficial" ownership interest in the institution or its corporate parent. *Id.* § 600.31(b)(2) (2021). And although the regulation itself did not define what qualifies a "beneficial interest" as an "ownership interest" in this context, numerous authorities across the law make clear that a beneficial ownership interest refers to a term of art with specific and longstanding requirements—not colloquially to any type of "benefit" whatsoever. *See, e.g.*, *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2023 WL 2576314, at *10 (N.D. Cal. Mar. 20, 2023) ("'[B]eneficial interest' or 'beneficial ownership' is often used to describe the tangible interests one has in securities held in trust or held by a brokerage firm as record owner." (citing *Mangano v. Pericor Therapeutics*, 2009 WL 4345149, at *5 (Del. Ch. Dec. 1, 2009)).

Specifically, a party with a beneficial ownership interest is someone "recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else," such as "one for whom property is held in trust." Black's Law Dictionary (11th ed. 2019); *see also, e.g.*, Mass. Gen. Laws ch. 156D, § 13.01 (defining "Beneficial shareholder" as "the person who is a beneficial owner of shares held in a voting trust or by a nominee as the record shareholder"). Put another way, a beneficial interest consists of an existing

18

power to control an equity interest—not a mere plan or expectation to acquire equity in the future. *See Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 63 (1st Cir. 1991) (explaining that, in the securities context, a beneficial owner refers to someone with "the 'power to vote;' the ability to 'direct a vote;' and the 'power to dispose' of stock"). Thus, Ms. DeNicola's purported "underst[anding]" that she could purchase EGFF Holding Co. at a discount in the future plainly did not amount to a beneficial ownership interest.[5]

### 2. Plaintiffs are not likely to succeed on their due process claim.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs claim that the Department's denial of Elizabeth Grady's claims for reimbursement was "not in accordance with law" because it deprived Plaintiffs of property without due process. ECF No. 1 at 21. They specifically assert that—before declining their reimbursement requests—the Secretary should have provided the school with advance notice and a hearing under 34 C.F.R. § 668.86. *Id.* at 21–22. Plaintiffs therefore seek an injunction requiring the Secretary to provide them with such a hearing. That claim, however, is not likely to succeed for at least two independent reasons.

*First*, Plaintiffs' claim hinges on their contention that the Secretary needed to provide them with notice and a hearing under 34 C.F.R. § 668.86. But, as explained above, those notice-and-hearing procedures apply only when the Secretary seeks to "limit" or "terminate" an institution's

---

[5] Moreover, even if Plaintiffs were correct, Elizabeth Grady still would have needed to report this change to the Secretary in a timely manner for it to qualify as an excluded transaction. 34 C.F.R. § 600.31(e) (2021) (referring to a "change in ownership and control *reported under § 600.21*") (emphasis added); *see also* 34 C.F.R. § 600.21. And there is no dispute that it expressly declined to do so, notwithstanding its auditor's recommendation. ECF No. 1-9 at 3.

eligibility for Title IV funding.  *Supra*, at p. 16–17.  They do not, by contrast, apply when an institution's eligibility has *automatically expired* due to a change in control.  34 C.F.R. § 668.14(g)(1) (2021).  Plaintiffs insist that "[i]t is axiomatic that the Department's rejection of the [s]chool's claim for reimbursement, stop pay order, determination that the [s]chool has lost its eligibility, and requirement that the [s]chool obtain surety constitute limitations under 34 C.F.R. § 668.94."  ECF No. 5 at 14.  But, as that regulation makes clear, a "limitation" refers to the imposition of a "*condition*" on an institution's continuing eligibility. 34 C.F.R. § 668.94 (emphasis added).  It does not encompass the consequences of a change in control, which results in the automatic cessation of eligibility.  34 C.F.R. § 668.14(g)(1) (2021); 34 C.F.R. § 600.31(a)(1) (2021).  After all, the Secretary need not—indeed, cannot—terminate or limit something that no longer exists.  *See San Juan City*, 74 Fed. Cl. at 454.

*Second*, the Due Process Clause does not apply because the government has not "deprived" Plaintiffs of a constitutionally protected property interest.  U.S. Const. Amend. V; *see also, e.g.*, *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (explaining that a plaintiff must "first" show that "there exists a liberty or property interest" to which it had "a legitimate claim of entitlement"); *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.").  Plaintiffs incorrectly frame the Department's decision to deny them reimbursement as "cut[ting] off" their financial aid.  ECF No. 5 at 20.  In truth, their participation automatically ceased by operation of law—not any action by the Department.  34 C.F.R. § 668.14(g).  Stated differently, upon the change in control, the school was no longer eligible to participate in Title IV programs, and needed to "[r]eestablish eligibility" and enter into a new participation agreement with the Secretary.  34 C.F.R. § 600.20(b)(2)(i)(B) (2021).

Even if Plaintiffs' framing were correct, their claim would still fail because they do not have a constitutionally protected property interest in the continued receipt of financial aid. *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992) ("Member schools have no 'vested right' to future eligibility to participate in [federal student loan programs]."). As the Supreme Court has explained, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). And the HEA vests the Secretary with substantial discretion in deciding whether to provide funding under Title IV. *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 349 (S.D.N.Y. 2015) ("[The HEA] gives DOE latitude to decide whether to confer Title IV funding eligibility on a particular program"). Even Plaintiffs appear to concede as much. *See* ECF No. 5 at 16 (acknowledging that "the Department's decision will be based on a number of factors"). Plaintiffs instead argue that "[t]he Department has a mandatory, non-discretionary duty to provide *notice and hearing* to the [s]chool pursuant to 34 C.F.R. § 668.86." ECF No. 1 ¶ 111 (emphasis added). But, in deciding whether a plaintiff has a protected property interest, the question is whether (and to what extent) the government has discretion to grant the *property* at issue—here, the financial aid.

### 3.  Plaintiffs are not likely to succeed on their mandamus claim.

Plaintiffs also seek "a writ of mandamus requiring the Department to reinstate the [s]chool's eligibility and timely process the [s]chool's request for reimbursement." ECF No. 1 ¶ 113. Yet, that claim fails at the outset because a federal district court may not issue a writ of mandamus. Fed. R. Civ. P. 81(b) ("The writs of scire facias and mandamus are abolished."). To be sure, 28 U.S.C. § 1361 generally permits a plaintiff to seek relief "in the nature of mandamus." But, to receive relief in the nature of mandamus, a party must show "that [it] has a clear right to

the relief sought, has no other adequate remedy, and that there is a clearly defined and peremptory duty on the part of the [defendant] . . . to do the act in question." *Georges v. Quinn*, 853 F.2d 994, 995 (1st Cir. 1988); *see also Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (explaining that § 1361 "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty").

      Plaintiffs argue that they have a clear right to notice and a hearing under 34 C.F.R. § 668.86, and that the Secretary has a duty to provide those procedures.  ECF No. 1 ¶ 111.  But, as already explained, this regulation (and its attendant procedures) applies to the limitation or termination of an institution's participation in Title IV; it does not require the Department to provide advance notice or a hearing to Plaintiffs, whose participation in Title IV automatically expired upon the change in ownership.  Moreover, Plaintiffs cannot reasonably claim that they have no other adequate remedy at law when they still have not completed the application process for Elizabeth Grady to reestablish its participation.  *Supra*, at p. 10.  Because Plaintiffs cannot satisfy the high standard for mandamus-type relief,  the Court lacks jurisdiction over this claim.  *See, e.g.*, *Mayburg v. Sec'y of Health & Hum. Servs.*, 740 F.2d 100, 108 (1st Cir. 1984) (Because statutory requirements were not met, "mandamus jurisdiction d[id] not extend to any of the claims").

      **C.  Plaintiffs have failed to establish irreparable harm.**

      In addition to showing a likelihood of success on the merits, "Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction."  *Akebia Therapeutics*, 443 F. Supp. 3d at 230 (citation omitted). Here, however, Plaintiffs' substantial delay significantly undercuts their claim of irreparable harm. *See id.* at 231 ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of

those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." (citation omitted)).  For starters, Ms. DeNicola could (and should) have notified the Department about her planned acquisition *several years ago*; sought provisional funding while reapplying for participation in Title IV; and thereby avoided any lapse in funding altogether.  *See infra*, at p. 24. Plus, the Department expressly informed Ms. DeNicola that Elizabeth Grady had "lost eligibility" back in May 2023.  ECF No. 1-9 at 1.  Plaintiffs did not, however, seek a preliminary injunction until October 27, 2023—*nearly half a year later*.  ECF No. 4.  Worse still, after being informed that Elizabeth Grady's eligibility had expired, Plaintiffs compounded the problem by delaying their application for reinstatement.  Despite granting Plaintiffs two 30-day extensions, the Department has still not received the required materials to provisionally reinstate their institution.

Moreover, Plaintiffs assert that "students will not be able to continue to attend the [s]chool and new students cannot be enrolled," and that they will "experience substantial loss of revenues" as a result.  ECF No. 5 at 17.  But, as this Court has recognized, "economic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction."  *Akebia Therapeutics*, 443 F. Supp. 3d at 230 (citation and alteration omitted). Moreover, although "economic losses may be sufficient" where "the loss threatens the very existence of the movant's business," *id.*, Plaintiffs have not set forth any *evidence* to substantiate their speculative claims about the institution's inability to continue as a going concern—such as "financial records or other data to support the predicted losses," *id.* at 231.  *See also Braintree Laboratories*, 622 F.3d at 42 ("Braintree's mere say-so is insufficient to convert its desire for prejudgment cash into a justification for a prejudgment injunction.").

**D.  The balance of equities and public interest weigh against preliminary injunctive relief.**

Nor have Plaintiffs shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction.  *Winter*, 555 U.S. at 32.  Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]."  *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014).  And then it considers whether "[t]he public interest weighs in favor of granting" the preliminary injunction.  *Id.* at 285.  But where, as here, the government is the defendant, these factors simply "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In balancing the equities, a movant's "alleged harm" receives little to no weight when that harm "is self-inflicted."  *Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993).  And, here, Plaintiffs likely could have avoided any lapse in Title IV funding if Ms. DeNicola had timely disclosed her purchase and complied with the regulatory requirements.  As explained above, "[a]n institution's program participation agreement automatically expires on the date that . . . [t]he institution changes ownership."  34 C.F.R. § 668.14(g)(1).  Thus, to avoid a lapse in funding following a change in ownership, the Department may continue to provide an institution with Title IV assistance on a *provisional basis* while its new owner applies for a new participation agreement with the Secretary.  34 C.F.R. § 600.20(g) (2021).  That said, to receive this provisional funding, the institution must submit a "materially complete application" for reinstatement "no later than 10 business days after the day the change occurs," *id.* § 600.20(g)(1) (2021), and comply with the additional requirements of § 600.20(h)(3) (2021).

Plaintiffs claim that Ms. DeNicola began negotiating her purchase of the shares in EGFF Holding Corp. from its previous owner, Mr. Walsh, as early as 2018.  Despite this early start, Ms. DeNicola failed to notify the Department about this proposed change *at any point* for the next

several years—up to and including the date of the transaction, on November 1, 2021.  What's more, when conducting the compliance audit for Elizabeth Grady that year, the auditor specifically flagged the change in ownership, and directed Ms. DeNicola to "discuss this finding with the Department of Education to take steps to resolve the issue as soon as possible."  ECF No. 1-9 at 2. Ms. DeNicola nonetheless declined to apprise the Department.  Indeed, she did not disclose information about this change in ownership until the following year, on November 7, 2022, when *the Department* contacted her after having reviewed the auditor's report.  By her own choosing, Ms. DeNicola declined to seek out and utilize the Department's procedures for provisional funding.  As a result, Plaintiffs cannot claim that the Department's actions—as opposed to these omissions and delay—will cause them irreparable harm that outweighs the government's interests.

Finally, the public plainly maintains a strong interest in ensuring that federal financial assistance goes only to eligible institutions.  Granting a preliminary injunction would undermine the Department's statutory obligation to uphold the same eligibility requirements that all institutions must meet to obtain Title IV funding.  And it would allow Elizabeth Grady to secure provisional assistance without adhering to the commonsense requirements that the Department has established for precisely these circumstances.  Moreover, if the Court were to require the Secretary to reinstate Elizabeth Grady and grant its reimbursement requests now, it is not at all clear whether the government could later recover those funds should the Secretary ultimately prevail in this litigation.  By contrast, and assuming arguendo that the anti-injunction provision does not apply, denying Plaintiffs' motion for preliminary relief would not impair their ability to obtain the full measure of permanent relief that they seek moving forward.

## V.    CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

Dated:  November 17, 2023             By:     */s/ Michael L. Fitzgerald*
                                              MICHAEL L. FITZGERALD
                                              Assistant United States Attorney
                                              U.S. Attorney's Office
                                              1 Courthouse Way, Ste. 9200
                                              Boston, MA 02210
                                              (617) 748-3266
                                              michael.fitzgerald2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney

Dated:  November 17, 2023