UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELIZABETH GRADY SCHOOL OF ESTHETICS AND MASSAGE THERAPY, et al., <br><br>        Plaintiffs, <br><br>   v. <br><br> MIGUEL CARDONA, *in his official capacity as Secretary of Education*, <br><br>        Defendant. | Civil Action No. 23-12461-ADB |

### <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS</u>

## I. INTRODUCTION

Elizabeth Grady, a postsecondary educational institution, and its corporate owners filed this suit against the Secretary of Education after being informed that the school had lost eligibility for financial assistance under Title IV of the Higher Education Act. Plaintiffs seek to enjoin the Secretary from "terminating" the school's participation in Title IV, and to require him to provide the school with more than one million dollars in student financial assistance. Defendant respectfully maintains that federal law precludes courts from entering an injunction—of any kind—against the Secretary. But, in all events, Plaintiffs have clearly failed to state an actionable claim for relief. All three of Plaintiffs' claims hinge on their contention that the Department failed to follow the notice-and-hearing procedures set forth in 34 C.F.R. §§ 668.86 and 600.41. As the Court has already concluded, however, those procedures apply only when the Department seeks to limit or terminate an institution's participation in Title IV programs. By contrast, Elizabeth Grady's eligibility *automatically ceased* when it underwent a change in ownership in November 2021. All three of Plaintiffs' claims therefore fail as a matter of law.

## II. BACKGROUND

### A. Legal Framework

#### 1. Federal Funding under the HEA.

Congress enacted the Higher Education Act of 1965 (HEA) "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." 79 Stat. 1219. "To that end, Title IV of the Act restructured federal financial aid mechanisms" and established several types of student loan and grant programs. *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023). The Department of Education administers these programs, and funding is provided to educational institutions which is then

disbursed for the benefit of their qualifying students. *See* 20 U.S.C. §§ 1070(b), 1094; 34 C.F.R § 668.162. The Secretary retains sole discretion in deciding how to provide such funding. 20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement . . . as the Secretary may determine."); *see also* 34 C.F.R. § 668.162(a) ("the Secretary has the sole discretion to determine the method under which the Secretary provides Title IV program funds to an institution").

"Under Title IV, for-profit, post-secondary educational institutions" may only "participate in the Title IV aid programs if they [meet] certain requirements." *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 102 (1st Cir. 2015). For example, a school seeking Title IV funding must qualify as "an institution of higher education," such as "a proprietary institution of higher education," or "a postsecondary vocational institution." 20 U.S.C. § 1002(a)(1); *see also Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 776–77 (1st Cir. 2000) ("To participate in the student assistance program, an educational institution must be an 'eligible' institution of higher education." (citing 20 U.S.C. § 1094(a))). Moreover, the institution must "enter into a program participation agreement with the Secretary." 20 U.S.C. § 1094(a). A program participation agreement "condition[s] the initial and continuing eligibility of an institution" on its compliance with several statutory requirements, as well as regulations issued by the Secretary. *Id.*

## 2. Regulations Governing Eligibility and Termination.

The HEA provides that "[a]n eligible institution of higher education that has had a change in ownership resulting in a change of control shall not qualify to participate in programs under this subchapter after the change in control," except in limited and specified circumstances. 20 U.S.C. § 1099c(i)(1). To that end, the Secretary has long promulgated regulations governing the eligibility status of institutions that undergo a change in ownership. For example, one of the

Department's regulations provided—and continues to provide—that an institution "that undergoes a change in ownership that results in a change in control ceases to qualify as an eligible institution upon the change." 34 C.F.R. 600.31(a)(1) (2021).

The Secretary has also issued a separate set of regulations governing the termination of an institution's participation in Title IV. These regulations—referred to as Subpart G—provide that, when the Department seeks to terminate an institution's participation, it must first provide notice and the opportunity to request a hearing before the termination takes effect. *See* 34 C.F.R. §§ 668.81 – 668.100. The Secretary's regulations further provided—and continue to provide— that "[e]xcept as provided in paragraphs (g) and (h)," the Secretary will "terminate[] a program participation agreement through the proceedings in subpart G." 34 C.F.R. § 668.14(f) (2021). Paragraph (g), in turn, provided—and continues to provide—that "[a]n institution's program participation agreement automatically expires on the date that . . . [t]he institution changes ownership that results in a change in control." *Id.* § 668.14(g) (2021). In addition, and as the Court has already observed, the termination procedures in Subpart G apply only "with respect to a *participating* institution." 34 C.F.R. § 668.81 (emphasis added); *see also* ECF No. 20 at 12.

During the relevant time, the Secretary's regulations also specified that certain transactions—referred to as "[e]xcluded transactions"—would not result in the automatic loss of an institution's eligibility. 34 C.F.R. § 600.31(e) (2021). For example, the regulations stated that "[a] change in ownership and control reported under § 600.21 and otherwise subject to this section does not include a transfer of ownership and control of all or part of an owner's equity," "[u]pon the retirement or death of the owner," to someone who had already retained an "ownership interest" and had "been involved in management of the institution for at least two years preceding the transfer." *Id.* § 600.31(e)(2) (2021). The regulations further defined an "ownership interest" as

3

"a legal or beneficial interest." *Id.* § 600.31(b) (2021). Thus, a transfer of equity from a retiring owner to someone who had already enjoyed an ownership interest in (and helped manage) the school for two years would not necessarily result in the automatic loss of eligibility. However, the institution must still report the change to the Secretary in a timely manner for it to qualify as an excluded transaction. *Id.* § 600.31(e) (2021) (referring to a "change in ownership and control *reported under § 600.21*") (emphasis added); *see also* 34 C.F.R. § 600.21.

### B. Procedural History

Elizabeth Grady provides educational programs to students pursuing licensing in the esthetics and massage therapy professions. ECF No. 1 ¶ 1. The school is owned and operated by Elizabeth Grady Face First, Inc., which, in turn, is owned by EGFF Holding Corp. *Id.* ¶ 11. Plaintiffs assert that Elizabeth Grady has sought and received financial aid for its students under Title IV "for over 30 years." *Id.* ¶ 15. And they allege that "[a]pproximately 85% of students have utilized student financial assistance through [Title IV] to help fund their education through the [s]chool," after which they "go on to obtain positions in esthetics or massage therapy." *Id.* ¶ 16.

Kathleen DeNicola began serving as the CFO of EGFF Holding Corp. in 2016. *Id.* ¶ 18. Just a few years later, she entered negotiations with its then-owner, John P. Walsh, to purchase the company. *Id.* ¶ 23. On September 8, 2021, Ms. DeNicola and Mr. Walsh executed a stock purchase agreement for Ms. DeNicola to acquire Mr. Walsh's shares in EGFF Holding Corp. which gave her ownership of Elizabeth Grady. *Id.* ¶ 19. According to Plaintiffs, Ms. DeNicola acquired EGFF Holding Corp. on November 1, 2021. *Id.* ¶ 2. Neither Ms. DeNicola nor Elizabeth Grady notified the Department about this transaction beforehand or at the time. *Id.* ¶ 24.

While performing Elizabeth Grady's annual audit for FY 2021, an independent auditor flagged the transaction between Ms. DeNicola and Mr. Walsh, and concluded that it should have

been reported to the Department. ECF No. 1-9 at 2. The Department's regulations—in effect at the time—stated that "an eligible institution must report to the Secretary" certain changes within 10 days after they occur—including certain changes in ownership, and even those that do not result in a change of control. 34 C.F.R. § 600.21(a)(6) (2021). Critically, the regulations also provide that an institution "that undergoes a change in ownership that results in a change in control *ceases to qualify as an eligible institution* upon the change in ownership and control." *Id.* § 600.31(a)(1) (2021) (emphasis added). To avoid a lapse in funding, the Department may continue to provide Title IV assistance on a *provisional basis* while the Department reviews the institution's application for a change of ownership. *Id.* § 600.20(g) (2021). But, to receive this *temporary* funding, the institution must submit a "materially complete application" "no later than 10 business days after the day the change occurs." *Id.* § 600.20(g)(1) (2021). Continued funding beyond an initial period of a maximum of two months requires the submission of additional documents. *Id.* § 600.20(h)(3) (2021). To that end, Elizabeth Grady's auditor recommended that Ms. DeNicola "discuss this [change in ownership] finding with [the Department] to take steps to resolve the issue as soon as possible." ECF No. 1-9 at 2.

Nonetheless, Ms. DeNicola did not report the transaction at that time. ECF No. 1 ¶ 24. Instead, she insisted that the transaction between her and Mr. Walsh did not amount to a "change in control." ECF No. 1-9 at 3. According to the auditor, Ms. DeNicola represented that the transaction did not amount to a change in control because she "had at least a 10% stake in" Elizabeth Grady's corporate owner for the two years prior to the transaction. *Id.* But, when asked to provide proof of that assertion, neither Ms. DeNicola nor Mr. Walsh provided any substantiating evidence. *Id.* The auditor then recommended that Ms. DeNicola report the transaction to the Department, but she declined to do so. *Id.* Elizabeth Grady also failed to submit its FY 2021 audit

to the Department by the June 30, 2022, deadline. *Id.* at 2. Indeed, the school did not submit this audit until October 14, 2022—more than three months later. *Id.*

After receiving this audit, the Department promptly contacted the auditor to ask about his finding. *Id.* at 3. It also contacted Ms. DeNicola to obtain information about the transaction. *Id.* And, after sending multiple inquiries and reviewing the requested documentation, the Department agreed with the auditor and concluded that Elizabeth Grady had, in fact, undergone a change in ownership resulting in a change of control (which neither Ms. DeNicola nor any other school official reported), and failed to meet the regulatory requirements for continued participation. *Id.* On May 12, 2023, the Department sent Ms. DeNicola a letter informing her of its determination that "Elizabeth Grady lost eligibility to participate in the student financial assistance programs authorized pursuant to Title IV . . . on November 1, 2021." *Id.* at 1. As a result, the Department placed Elizabeth Grady on a "Stop Pay" order (thus prohibiting the school from accessing or drawing down any remaining Title IV funds) and declined to grant its pending reimbursement request for the same reason. *Id.*; *see also* ECF No. 1-10 at 1; ECF No. 1-11 at 1.

Later that month, Plaintiffs' counsel contacted the Department, seeking to discuss the Department's determination that the school's eligibility had expired. ECF No. 1-15 at 12–13. Plaintiffs' counsel also requested a hearing, asserting that, "[u]nder 34 C.F.R. 668.86(b)," a "termination" should not take effect if the Department timely "receives a request for a hearing." *Id.* at 8. In response, the Department explained that a loss of eligibility following a change of ownership "is neither a limitation or termination, and therefore is not subject to the Subpart G requirements for a hearing." *Id.* The Department also informed them that Elizabeth Grady could "seek[] to reestablish eligibility so it can be reinstated to participate in the Title IV, HEA programs." *Id.* at 8–9. To do so, the school would need to submit the required documents and

information in the next 10 business days. *Id.* at 9. Plaintiffs' counsel then requested an additional 30 days, which the Department promptly granted. *Id.* at 5. And, on October 19, 2023, Plaintiffs sought another 30-day extension, which the Department granted as well. *Id.* at 2.

The very next day, rather than taking the opportunity to submit the required materials and submit an application to reestablish eligibility, Plaintiffs instead filed the complaint in this case— asserting three causes of action. ECF No. 1 at 21–25. *First*, Plaintiffs seek a declaratory judgment "affirming that the Department has violated 34 C.F.R. § 668.86(b) and § 600.41(c)(1)" by "terminating" their eligibility without providing notice and a hearing. *Id.* at 20. *Second*, Plaintiffs seek an injunction under the Administrative Procedure Act (APA), arguing that the Department deprived them of due process by, again, failing to follow the notice-and-hearing procedures under 34 C.F.R. § 668.86. *Id.* at 21–22. *Third*, Plaintiffs seek a writ of mandamus, similarly arguing that the Department had "a mandatory, non-discretionary duty to provide notice and hearing to the [s]chool pursuant to 34 C.F.R. § 668.86." *Id.* at 23.

Plaintiffs also filed a motion for a preliminary injunction, after which the Court received briefing, held a hearing, and issued an order denying the motion. ECF No. 20. The Court found that while it did not have jurisdiction to order the Secretary "to process and pay reimbursements," it could issue injunctive relief enjoining him "from terminating the Plaintiffs' participation in Title IV," and requiring him "to continue Plaintiffs' eligibility . . . while the Court reviews this matter." *Id.* at 8. That said, the Court found that Plaintiffs were not likely to succeed on their claims. Although Plaintiffs claimed that they were entitled to the notice-and-hearing procedures under Subpart G, the Court concluded that their "participation in and eligibility for Title IV programming" had "automatically" ceased, and so "they were not a participating and eligible institution for purposes of Subpart G." *Id.* at 12.

### III.    LEGAL STANDARD

A district court should dismiss claims under Federal Rule of Civil Procedure 12(b)(1) when it lacks subject matter jurisdiction to decide them.  That includes where, as here, the federal government has not waived its sovereign immunity for the types of claims at issue.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature").  In ruling on a motion to dismiss for lack of jurisdiction, the district court construes the complaint "liberally and treat[s] all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).  Still, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Id.* (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)).

In addition, a district court should dismiss claims under Federal Rule of Civil Procedure 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "The plausibility standard invites a two-step pavane." *A.G. ex rel. Maddox v. v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013).  "At the first step, the court 'must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012)).  "At the second step, the court must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*  A district court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under

some actionable legal theory.'" *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)).

To be sure, where the dispute at hand involves whether the administrative record supports an agency's action, district courts in this circuit generally decide that question on a motion for summary judgment. *See Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). But where an agency raises a threshold legal argument that the complaint fails to state a claim upon which relief can be granted, a district court may decide that antecedent legal issue on a motion to dismiss. *See, e.g.*, *id.* at 76 n.4 (explaining that a Rule 12(b)(6) motion "might lie where the agency claims that the underlying premise of the complaint is legally flawed (rather than factually unsupported)"); *LFOP v. Mayorkas*, 656 F. Supp. 3d 274, 277 (D. Mass. 2023) (dismissing APA claim under Rule 12(b)(6)). The question thus becomes not whether the agency has acted arbitrarily, capriciously, or contrary to law—but whether the complaint states a plausible claim that the agency has acted arbitrarily, capriciously, or contrary to law. Put another way, 5 U.S.C. § 706 sets forth a standard of review applicable to APA cases (after the pleading stage), whereas *Iqbal/Twombly* sets forth a pleading standard applicable to all civil cases (including APA claims).

## IV.   ARGUMENT

### A.  The Court should dismiss Plaintiffs' "declaratory judgment" claim (Count I).

#### 1.  Plaintiffs lack standing to obtain a declaratory judgment.

"A plaintiff has standing only if he can 'allege [a] personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citation omitted). To that end, "plaintiffs must demonstrate standing for each claim that they press and *for each form of relief that they seek*." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (emphasis added). The plaintiffs in this

case claim that they have suffered, and continue to suffer, serious financial harm fairly traceable to the Department's alleged violations of 34 C.F.R. §§ 668.86(b) and 600.41(c)(1)—namely, its alleged failure to follow the notice-and-hearing procedures contemplated by those regulations. But, from there, they "seek a declaration affirming that the Department has violated 34 C.F.R. § 668.86(b) and § 600.41(c)(1)." ECF No. 1 ¶ 89. Plaintiffs lack standing to obtain this relief because such a declaration would not redress their alleged injuries.

Unlike an injunction, a declaratory judgment would not require the Secretary to take—or enjoin him from taking—any action. It would not require him to grant past reimbursement requests or provide federal funding moving forward. Nor would it require him to afford Plaintiffs a hearing or reinstate Elizabeth Grady's participation in Title IV. In the context of this case, a declaratory judgment would instead amount to an advisory opinion that the Department has violated its own regulations. To be sure, an opinion finding that the Department violated 34 C.F.R. §§ 668.86(b) and 600.41(c)(1) could prompt the Secretary to take those actions—but a declaratory judgment would not by its own force require those actions. And, as the Supreme Court has recently reiterated, "[i]t is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023); *see also Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment) ("If courts may simply assume that everyone . . . will honor the legal rationales that underlie their decrees, then redressability will always exist.").

### 2. Plaintiffs have not identified an applicable cause of action.

In any event, the Court should dismiss Count I because it does not identify an applicable cause of action. Although Plaintiffs allege that the Department violated 34 C.F.R. §§ 668.86(b) and 600.41(c), neither of those regulations purports to create a private right of action. And

although Plaintiffs cite the Declaratory Judgment Act, that statute "creates a remedy, not a cause of action." *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *see also, e.g.*, *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("the availability of [declaratory relief] presupposes the existence of a judicially remediable right"); *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996) (The Declaratory Judgment Act "neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief." (quoting *McCarthy v. Marshall*, 723 F.2d 1034, 1037 (1st Cir. 1983))); *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) ("The Declaratory Judgment Act does not provide a cause of action when a party . . . lacks a cause of action under a separate statute and seeks to use the Act to obtain affirmative relief."). Because Plaintiffs have not identified an applicable cause of action, through which they could obtain a declaratory judgment, the Court should dismiss Count I for lack of subject matter jurisdiction. *See PCS 2000 LP v. Romulus Telecommunications, Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) ("Unless a federal statute bestows a private right of action, courts ought to presume that Congress did not intend the statute to confer federal jurisdiction."). And insofar as Plaintiffs meant to seek a declaratory judgment as relief for their *APA claim* (Count II), that request would still fail for the reasons described below.

**B. The Court should dismiss Plaintiffs' APA claim (Count II).**

**1. The Court lacks jurisdiction to issue injunctive relief.**

Defendant respectfully maintains that the HEA precludes courts from issuing injunctions against the Secretary. *See* ECF No. 15 at 11–14. However, given the Court's finding that the HEA does not preclude certain types of injunctions, ECF No. 20 at 8–9, Defendant will not repeat those arguments in full here. *Cf. Massachusetts Correction Officers Federated Union v. Baker*, 630 F. Supp. 3d 249, 254 (D. Mass. 2022) (a district court's rulings of law on a preliminary injunction

"may be deemed law of the case" where the record was "sufficiently developed and the facts necessary to shape the proper legal matrix were sufficiently clear").

### 2. Plaintiffs have failed to state a claim under the APA.

Even if the Court could grant some form of injunctive relief, it should still dismiss Count II for failure to state a claim. Plaintiffs' APA claim hinges on their erroneous interpretation of the Department's regulations, and, specifically, their contention that those regulations required the Department to provide Elizabeth Grady with notice and a hearing before declining to provide the school further financial assistance. ECF No. 1 ¶¶ 90-102. But, as described below, those regulations plainly do not apply—even accepting the complaint's factual allegations as true. And because Plaintiffs' claim turns on an incorrect interpretation of the law, the Court can resolve it under Rule 12(b)(6). *See, e.g.*, *Simmons v. Galvin*, 575 F.3d 24, 30 (1st Cir. 2009) ("questions of statutory interpretation are questions of law ripe for resolution at the pleadings stage"); *Cook v. Rumsfeld*, 429 F. Supp. 2d 385, 387 (D. Mass. 2006) ("dismissal of a complaint for failure to state a claim under Rule 12(b)(6) is appropriate where there are dispositive issues of law that bar the plaintiffs' claims even if they are able to prove the factual assertions made in the complaint").

### a. The Department did not "limit" or "terminate" Elizabeth Grady's participation in Title IV.

The APA provides that a reviewing court may "hold unlawful and set aside agency action" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs claim that the Department did not act "in accordance with law" because it "failed to abide by the established regulatory procedures" set forth in 34 C.F.R. §§ 668.86 and 600.41. ECF No. 1 ¶¶ 90-102. That claim fails as a matter of law, however, because neither of those regulations even applies. As the Court has already concluded, the notice-and-hearing procedures in Subpart G apply "with respect to *a participating institution*." ECF No.

20 at 12 (citing 34 C.F.R. § 668.81(a)).  Whereas, here, "Plaintiffs' participation in and eligibility for Title IV programming automatically expired under 34 C.F.R. §§ 600.31(a)(1) and 668.14(g), and thus they were not a participating and eligible institution for purposes of Subpart G."  *Id.*

The first regulation—titled "Limitation or termination proceedings"—provides that the Department may "terminate an institution's participation" in Title IV if the institution violates any statute, regulation, or agreement applicable to Title IV.  34 C.F.R. § 668.86(a).  The Department begins a termination proceeding by sending "a notice by certified mail," which, among other things, informs the institution of "the proposed effective date of the . . . termination."  *Id.* § 668.86(b)(1)(ii).  And if the institution timely "requests a hearing," the termination "does not take place until after the requested hearing is held."  *Id.* § 668.86(b)(3).  The second regulation— titled "Termination and emergency action proceedings"—similarly states that "[a]n action to terminate" an institution's participation "becomes final 20 days after the Secretary notifies the institution of the proposed action, unless the designated department official receives by that date a request for a hearing."  34 C.F.R. § 600.41(c)(1) (2021).

Plaintiffs claim that the Department violated these regulations because it did not send them notice or hold a hearing at their request.  ECF No. 1 ¶¶ 90-102.  But those procedures—set forth in Subpart G of the Student Assistance General Provisions—apply when the Department seeks to *terminate* an institution's participation based on, for example, a regulatory violation.  Here, by contrast, the Department did not seek to terminate Elizabeth Grady's participation.  Instead, by virtue of the HEA and its implementing regulations, and without any action by the Department, the institution "cease[d] to qualify as an eligible institution upon the change in ownership and control."  34 C.F.R. § 600.31(a)(1) (2021).  Indeed, the Department's regulations expressly provide that the notice-and-hearing procedures governing terminations *do not apply* when an institution

undergoes a change in control: "the Secretary terminates a program participation agreement through the proceedings in subpart G," "*[e]xcept as provided in paragraphs (g)* and (h) of this section." 34 C.F.R. § 668.14(f)(1) (2021) (emphasis added). Paragraph (g), in turn, applies when an institution undergoes a "change in control as determined by the Secretary," *id.* § 668.14(g)(1) (2021), which is precisely what happened here.

The regulations further distinguish between (i) the automatic expiration of an institution's participation agreement and (ii) the termination of an institution's participation with respect to the timing of those different types of events. Again, the HEA conditions an institution's participation on its maintenance of "a program participation agreement with the Secretary." 20 U.S.C. § 1094(a). And the regulations make clear that "[a]n institution's program participation agreement automatically expires *on the date* that . . . [t]he institution changes ownership." 34 C.F.R. § 668.14(g)(1) (2021) (emphasis added); *see also* 34 C.F.R. § 600.31(a)(1) (2021) (providing that an institution "that undergoes a change in ownership that results in a change in control ceases to qualify as an eligible institution *upon* the change in ownership and control" (emphasis added)). By contrast, when the Department seeks to terminate an institution's participation, and the institution requests a hearing, the termination does not take effect "until *after* the requested hearing is held." 34 C.F.R. § 668.86(b)(3) (emphasis added). Put another way, when Elizabeth Grady changed ownership, it ceased being an eligible institution, its participation agreement "automatically expire[d]," and the school "no longer had an active [participation agreement] for the [Department] to terminate or suspend through procedures of any sort, including notice or hearing procedures." *San Juan City Coll., Inc. v. United States*, 74 Fed. Cl. 448, 454 (2006).

b. <u>Ms. DeNicola's acquisition of EGFF Holding Co. did not constitute an excluded transaction.</u>

In addition, Plaintiffs briefly state that Ms. DeNicola "believe[d]" that her transaction with Mr. Walsh "constituted an exempt transaction under 34 C.F.R. § 600.31(e)." ECF No. 1 ¶¶ 2, 24. As explained above, the Department's regulations provided that certain transfers of equity in an institution would not result in an automatic loss of eligibility. The regulations provided that "[a] change in ownership and control reported under § 600.21 and otherwise subject to this section does not include a transfer of ownership and control of all or part of an owner's equity," "[u]pon the retirement or death of the owner," to someone who had already retained an "ownership interest" in the institution and had "been involved in management of the institution for at least two years preceding the transfer." 34 C.F.R. § 600.31(e)(2) (2021). And they further defined an "ownership interest" as "a legal or beneficial interest." *Id.* § 600.31(b) (2021). To that end—although Ms. DeNicola had originally sought to invoke this exemption by claiming that she owned 10% of EGFF Holding Co.—Plaintiffs *now* claim that she instead "believed" that she had retained a "beneficial interest" in the company for two years prior to the transaction. ECF No. 1 ¶ 23.

Plaintiffs have not, however, set forth any factual allegations (or even a colorable argument) that—accepted as true—would establish that Ms. DeNicola obtained and maintained a beneficial ownership interest in EGFF Holding Co. two years prior to November 2021. Instead, they claim that during the negotiations "it was understood between Mr. Walsh and Ms. DeNicola that she would receive a significant discount on the purchase price of EGFF Holding Co." *Id.* And they assert that "[t]he [s]chool and Ms. DeNicola *believed* that" her purported "option to purchase EGFF Holding Co. at a discount not available to other potential bidders constituted a beneficial interest." *Id.* (emphasis added). But Plaintiffs fail to cite any legal authority suggesting that such an option or belief amounts to a beneficial ownership interest in a company.

Nor could they. The relevant regulation defined excluded transactions as including (among other requirements) a transfer of equity to a person who had obtained and maintained "an *ownership interest* in the institution" for two years before the transaction. 34 C.F.R. § 600.31(e) (2021) (emphasis added). It further explained that an "ownership interest" must have consisted of a "legal" ownership interest or a "beneficial" ownership interest in the institution or its corporate parent. *Id.* § 600.31(b)(2) (2021). And although the regulation itself did not define what qualifies a "beneficial interest" as an "ownership interest" in this context, numerous authorities across the law make clear that a beneficial ownership interest refers to a term of art with specific and longstanding requirements—not colloquially to any type of "benefit" whatsoever—especially one based on a threadbare allegation of "belief." *See, e.g.*, *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2023 WL 2576314, at *10 (N.D. Cal. Mar. 20, 2023) ("'[B]eneficial interest' or 'beneficial ownership' is often used to describe the tangible interests one has in securities held in trust or held by a brokerage firm as record owner." (citing *Mangano v. Pericor Therapeutics*, 2009 WL 4345149, at *5 (Del. Ch. Dec. 1, 2009)).

Specifically, a party with a beneficial ownership interest is someone "recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else," such as "one for whom property is held in trust." Black's Law Dictionary (11th ed. 2019); *see also, e.g.*, Mass. Gen. Laws ch. 156D, § 13.01 (defining "Beneficial shareholder" as "the person who is a beneficial owner of shares held in a voting trust or by a nominee as the record shareholder"). Put another way, a beneficial interest consists of an existing power to control an equity interest—not a mere plan or expectation to acquire equity in the future. *See Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 63 (1st Cir. 1991) (explaining that, in the securities context, a beneficial owner refers to someone with "the 'power to vote;' the ability to

'direct a vote;' and the 'power to dispose' of stock"). Thus, Ms. DeNicola's purported "underst[anding]" that she could purchase EGFF Holding Co. at a discount in the future plainly did not amount to a beneficial *ownership* interest.

In any event, Ms. DeNicola still would have needed to report this change to the Secretary in a timely manner for it to qualify as an excluded transaction. 34 C.F.R. § 600.31(e) (2021) (referring to a "change in ownership and control *reported under § 600.21*") (emphasis added); *see also* 34 C.F.R. § 600.21. And, as the Court has already found, there is no dispute that she expressly declined to do so, notwithstanding the independent auditor's recommendation. *See* ECF No. 20 at 11 n.5 ("Nor did they report the transaction *as required* even if it were exempt.") (emphasis added); ECF No. 1 ¶ 24; ECF No. 1-9 at 3. Accordingly, Ms. DeNicola's acquisition of EGFF Holding Co. would not qualify as an excluded transaction even if she had somehow obtained and maintained a "beneficial interest" in the company during the two years beforehand.

### 3. Plaintiffs have failed to state a due process violation.

As part of their APA claim, Plaintiffs also summarily allege that the Department violated Elizabeth Grady's "procedural due process rights." ECF No. 1 ¶ 99. Plaintiffs assert that—before declining their reimbursement requests—the Department should have provided the school with advance notice and a hearing under 34 C.F.R. § 668.86. But that allegation fails to state an actionable claim for relief for at least two independent reasons.

*First*, Plaintiffs' claim again hinges on their contention that the Department needed to provide them with notice and a hearing under 34 C.F.R. § 668.86. But, as explained above, those procedures apply only when the Department seeks to "limit" or "terminate" an institution's eligibility for Title IV funding. *Supra*, at p. 12–14. They do not apply when an institution's eligibility has *automatically ceased* due to a change in control. 34 C.F.R. § 668.14(g)(1) (2021).

Plaintiffs insist that "[t]he Department's rejection of the [s]chool's claim for reimbursement, stop payment order, determination that the [s]chool has lost its eligibility, and requirement that the [s]chool obtain surety, in a specified amount, to assure its ability to meet its financial obligations to students who receive Title IV, HEA program funds constitute limitations under 34 C.F.R. § 668.94." ECF No. 1 ¶ 93. But a "limitation" refers to the imposition of a "*condition*" on an institution's continuing eligibility. 34 C.F.R. § 668.94 (emphasis added). It does not encompass the consequences of a change in control, which results in the automatic cessation of eligibility. 34 C.F.R. §§ 668.14(g)(1) (2021), 600.31(a)(1) (2021). After all, the Secretary cannot terminate or limit something that no longer exists. *See San Juan City*, 74 Fed. Cl. at 454.

*Second*, the Due Process Clause does not apply because the government has not "deprived" Plaintiffs of a constitutionally protected property interest. U.S. Const. Amend. V; *see also, e.g.*, *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (explaining that a plaintiff must "first" show that "there exists a liberty or property interest" to which it had "a legitimate claim of entitlement"); *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Plaintiffs incorrectly frame the Department's decision to deny them reimbursement as "terminating" their eligibility for financial aid. ECF No. 1 ¶ 99. In truth, their participation automatically ceased by operation of law—not any action by the Department. 34 C.F.R. § 668.14(g). Stated differently, upon the change in control, the school was no longer eligible to participate in Title IV programs, and needed to "[r]eestablish eligibility" and enter into a new participation agreement with the Secretary. 34 C.F.R. § 600.20(b)(2)(i)(B) (2021).

Even if Plaintiffs' framing were correct, their claim would still fail because they do not have a constitutionally protected property interest in the continued receipt of financial aid. *Ass'n*

*of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992) ("Member schools have no 'vested right' to future eligibility to participate in [federal student loan programs]."). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). And the HEA vests the Secretary with substantial discretion in deciding whether to provide funding under Title IV. *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 349 (S.D.N.Y. 2015) ("[The HEA] gives DOE latitude to decide whether to confer Title IV funding eligibility on a particular program"). Plaintiffs instead argue that "[t]he Department has a mandatory, non-discretionary duty to provide *notice and hearing*." ECF No. 1 ¶ 111 (emphasis added). But, in deciding whether a plaintiff has a protected property interest, the question is whether (and to what extent) the government has discretion to grant the *property* at issue—here, the financial aid.

### C. The Court should dismiss Plaintiffs' "mandamus" claim (Count III).

Finally, in Count III, Plaintiffs seek "a writ of mandamus requiring the Department to reinstate the [s]chool's eligibility and timely process the [s]chool's request for reimbursement." ECF No. 1 ¶ 113. Yet, that claim fails at the outset because a federal district court may not issue a writ of mandamus. Fed. R. Civ. P. 81(b) ("The writs of scire facias and mandamus are abolished."); *see also, e.g.*, *MacNeil v. Americold Corp.*, 735 F. Supp. 32, 36 (D. Mass. 1990) ("that writ has been abolished in Federal District Court[s]"); 12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and Procedure § 3134 (3d ed. Apr. 2023 update) (explaining that the Federal Rules of Civil Procedure "abolished the writ of mandamus in district court practice" but did "not affect the power of the courts of appeals to issue such writs").

To be sure, the Mandamus and Venue Act of 1962—codified at 28 U.S.C. § 1361—generally permits a plaintiff to seek relief "in the nature of mandamus." But the complaint does

not cite or otherwise attempt to invoke this statute—let alone set forth allegations that might establish its applicability. Moreover, relief "in the nature of mandamus" refers to a narrow species of *injunctive* relief. *See* Wright & Miller, Federal Practice and Procedure § 3134 n.10 ("a motion for injunctive relief now takes the place of a prayer for mandamus"). And, as Defendant has maintained, the anti-injunction clause of the HEA precludes Plaintiffs from obtaining such relief. ECF No. 15 at 11–14; *see also* ECF No. 20 at 8 n.4 (noting that Plaintiffs "appear to concede that the Court does not have jurisdiction to impose an injunction pursuant to [their] mandamus claim").

Regardless, even if Plaintiffs had sought to invoke § 1361, their claim would still fail. Relief under § 1361 requires that a plaintiff satisfy the traditional requirements for obtaining the common-law writ of mandamus. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). Thus, "a movant must show that: (1) his claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt; and (3) no other remedy offering adequate relief is available." *Khitab v. Novak*, 524 F. Supp. 2d 105, 107 (D. Mass. 2007). Plaintiffs claim that "the Department ha[d] a mandatory, non-discretionary duty to provide notice and hearing to the [Elizabeth Grady] pursuant to 34 C.F.R. § 668.86." ECF No. 1 ¶ 111. But this regulation applies to the termination of an institution's participation in Title IV; it did not require the Department to provide advance notice or a hearing to Elizabeth Grady, whose participation in Title IV automatically ceased upon the change in ownership. Because Plaintiffs cannot satisfy the high standard for mandamus-type relief, the Court lacks jurisdiction over this claim. *Mayburg v. Sec'y of Health & Hum. Servs.*, 740 F.2d 100, 108 (1st Cir. 1984) (Because statutory requirements were not met, "mandamus jurisdiction d[id] not extend to any of the claims").

## V. CONCLUSION

The Court should dismiss Plaintiffs' complaint with prejudice.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

Dated:  December 29, 2023          By:     */s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney

Dated:  December 29, 2023